DAVID M. GLOVER, Judge
Kristen James appeals from the termination of her parental rights to PJ (D.O.B. 11-18-2006). In this appeal, she contends DHS did not prove a statutory ground for termination nor potential harm under the best-interest determination. We disagree and affirm.
Summary of Interim Trial Court Orders
The affidavit supporting the DHS petition for emergency custody included the following pertinent statements: On August 5, 2016, Cindy Edrington (DHS employee) received a phone call from Officer Jimmy *220 Wicker of the Fayetteville Police Department. Wicker told her he was at the scene of a minor car accident. He reported that Kristen James, the driver, had left the scene of the accident and that Kristen's son, PJ, a woman named Shannon Spence, and Shannon's son, Dane, were still at the scene. Cindy arrived at the scene and noted the odor of intoxicants when she approached Shannon. DHS took an emergency 72-hour hold on both PJ and Dane because Shannon was not responding "appropriately" to questions, was apparently too intoxicated to care for the children, and no other legal caregiver was available for PJ. In the course of securing the situation, PJ told the family-service worker Kristen and Shannon had dropped PJ and Dane off at the movies and then went "to the bar to drink." The affidavit also listed the following DHS history with Kristen: 4/22/16 allegations of threat of harm with sons, PJ, TT, and CT as the victims-allegations were unsubstantiated; CT and TT, Kristen's two older sons were in their father's custody; "Through a DR referral, Kristen received services of home visits."
On August 8, 2016, an ex parte order for emergency custody was entered, followed by a probable-cause hearing and entry of a probable-cause order on August 10, 2016. Legal custody of PJ was placed with his paternal grandparents, Peggy and James Bledsoe, effective August 15, 2016. PJ's father is deceased.
On September 29, 2016, the adjudication and disposition order was entered, finding PJ dependent-neglected as a result of neglect and parental unfitness. The trial court specifically found Kristen was drinking alcohol and fled the scene of a car accident because she did not want to wait for the police to arrive and did not want to get arrested; she placed PJ in harm's way when she left him with Shannon Spence, who was too intoxicated to stand at the time she was arrested; Kristen either had a drinking problem or some other type problem because she thought this situation was everyone else's fault; and she was not credible. PJ was ordered to remain in the Bledsoes' custody.
The trial court ordered Kristen to do certain things, including cooperate with DHS and contact a designated family-service worker once a week; participate in individual counseling and follow recommendations; refrain from using illegal drugs/alcohol/abusing prescription meds; undergo a drug-and-alcohol assessment and follow recommendations; submit to weekly random drug screens with DHS observing production of the sample; complete twelve hours of parenting classes before December 26, 2016, and demonstrate improved parenting skills; obtain and maintain stable housing and employment; maintain a clean, safe home; demonstrate ability to protect PJ and keep him safe from harm; maintain contact with her attorney; submit to a hair-follicle drug screen within ten days (October 9, 2016) and not cut or dye her hair before the hair-follicle drug screen; and follow the case plan and court orders. Kristen was not ordered to pay child support at the time.
The February 3, 2017 review order found partial compliance with the case plan and court orders, but stated that Kristen had not exercised all available visits with PJ, missing approximately half of them; that she was having emotional problems; that she had completed the parenting classes, obtained a psychiatric evaluation, and undergone one round of counseling; but that she had not demonstrated she could properly and safely parent PJ. The review order further stated in part that Kristen was not to use any alcohol at all; that she was to undergo another round of *221 individual counseling; that she was to submit to supervised random drug screens twice a month; that she was to obtain and maintain stable housing and employment; that she was to demonstrate the ability to protect PJ; and that she was to follow the case plan and court orders.
By order entered on March 17, 2017, the court appointed a special advocate for PJ. The record also contains a bench warrant for failure to appear dated June 7, 2017, and a charge for contempt of court dated September 28, 2016.
The June 8, 2017 review order found that Kristen had not complied with all of the case plan and court orders; specifically, she had not kept in weekly contact with DHS; had not provided DHS with documentation of her employment; had not submitted to all random weekly drug screens; had not attended every visit offered her; and had made "minimal progress towards alleviating or mitigating the causes of [PJ's] removal from the home and completing the court orders and requirements of the case plan." The court did find that Kristen was participating in individual counseling, and reunification was retained as the goal. The court ordered no contact between PJ and Kristen, concluding visitation was not in PJ's best interest because Kristen was "not making good choices" and was "not exercising all of her visitation opportunities currently." The court also stated that Kristen was not to attend PJ's sporting events. She was still not ordered to pay child support at that point.
The August 23, 2017 permanency-planning order continued custody of PJ with his grandparents, and the goal of the case was changed to authorize a plan for adoption, with DHS filing a petition to terminate Kristen's parental rights. The trial court found Kristen had complied with some of the court orders and case plan but not all. Specifically, she had completed two rounds of therapy and provided proof of discharge, and she had completed twelve hours of parenting classes. However, she had not maintained weekly contact with DHS; she had not submitted to all of the requested random drug screens; her July 2017 hair-follicle drug screen was positive for marijuana, and she had also dyed her hair prior to the test in violation of the court's order; she refused a drug screen on August 15, 2017, stating she could not produce a urine sample; and, as the court continued to find, she lacked credibility regarding her sobriety and stability. The court further found Kristen had not demonstrated she could protect PJ and keep him safe from harm; she could not meet his basic needs; she had not made significant, measurable, sustainable progress toward alleviating or mitigating the causes of PJ's removal and completing the court's orders and case-plan requirements. The court continued the no-contact order, stating it was not in PJ's best interest to have visits with his mom. The prior court orders were continued, and in addition, Kristen was ordered to begin paying monthly child support on September 1, 2017, and to have a drug screen that day. The court further found PJ had an "explicit interest" in staying with his grandparents and being adopted by them.
DHS filed a petition to terminate parental rights on August 28, 2017. The statutory grounds asserted were 1) PJ had been out of Kristen's custody for twelve months and despite meaningful efforts by DHS to rehabilitate her and correct the conditions that caused removal, those conditions had not been remedied by Kristen; 2) PJ had lived outside the home for twelve months and Kristen had willfully failed to provide significant material support or maintain meaningful contact with PJ; and 3) subsequent factors arose after filing the petition for dependency-neglect demonstrating *222 placement in Kristen's custody would be contrary to PJ's health, safety, or welfare and despite the offer of appropriate family services, Kristen had manifested the incapacity or indifference to remedy the subsequent issues.
TPR Hearing
The termination hearing was held on December 7, 2017. The hearing was fact intensive with seven witnesses.
Courtney Willis (family-service worker "FSW"). The FSW testified that at no point in the case had DHS been able to place PJ on a trial home placement with Kristen because of continued safety concerns. She explained: the psychological evaluation reflected Kristen had a severe depressive disorder for which she was taking no medication; the home study reflected concerns about the persons with whom Kristen indicated she would leave PJ if necessary; Kristen had not participated in the case plan or court orders until the permanency-planning stage; at no point in the case had Kristen been in full compliance; and Kristen had not visited with PJ nor provided a reasonable excuse for not doing so to the point the trial court ordered the visits to stop because it was not in PJ's best interest to schedule them and have her not come.
The FSW testified Kristen was in partial compliance at the time of the termination hearing because she had completed a psychological evaluation, started participating in weekly drug screens, and completed counseling; however, the FSW stated she did not believe Kristen had demonstrated a pattern of sobriety nor made measurable, sustainable progress toward reunification with PJ and had not demonstrated the ability to protect PJ and keep him safe from harm. She recommended the termination of Kristen's parental rights so PJ could be adopted by his grandparents. The FSW testified PJ was "absolutely" an adoptable juvenile and that his paternal grandparents, with whom he had been staying, had been identified as wanting to adopt him.
On cross-examination, the FSW acknowledged the psychological evaluation recognized Kristen had strengths in her ability to provide for her child's needs but also pointed out the evaluation listed weaknesses in warmth, openness, sensitivity, and trust. She further recognized the counseling reports found Kristen had taken responsibility for her past actions but stated her opinion that PJ had been out of the home for over a year and needed permanency and stability, which the FSW did not believe Kristen could provide. She reiterated her concerns about Linda Youngman serving as a caretaker and also stated she had concerns about Kevin Warford, another person Kristen had listed as a caregiver in her plans for child care. She stated she had suspicions Kevin was living in Kristen's house.
Peggy Bledsoe (PJ's paternal grandmother). Ms. Bledsoe testified PJ was placed in her home in August 2016 and had lived there since that time. She stated he was "doing great," making straight A's, playing basketball, adjusting to his new living arrangements, and expressing happiness about not visiting with his mother. She stated her desire to adopt PJ if Kristen's parental rights were terminated.
Kevin Warford. He acknowledged Kristen had talked to him about possibly taking care of PJ on occasion but explained he had not yet done so. He denied ever living with Kristen, stating he lived with his elderly parents and took care of them. He also denied he and Kristen were in a relationship. He said he had been around Kristen and PJ in 2016, prior to PJ being taken by DHS, and PJ did not seem afraid of his mom. He commented Kristen was *223 appropriate with PJ. He explained he saw Kristen every two to three weeks, and she did not appear to be under the influence of controlled substances, drugs, or alcohol when he was around her. He expressed his belief Kristen was a good mother and said there would be no reason for concern about PJ living with her. On cross-examination, Kevin stated he had been around Kristen about the same amount of time before PJ was taken into DHS custody, but he acknowledged he had not realized drugs and alcohol were a problem for Kristen until it was brought to his attention when PJ was taken into emergency custody.
Linda Youngman. She knew Kristen, who lived two doors down from her; nobody lived with Kristen. She acknowledged never having seen Kristen interact with PJ but stated Kristen was great with Linda's grandchildren and neighborhood children. She testified she saw Kristen almost daily and had never noticed her under the influence of drugs or drinking. She acknowledged she was listed in the home study as an area of concern but denied having a "true finding" for sexual abuse. She testified she would not be a danger to PJ. She further testified Kristen was an appropriate and good mother. She stated Kristen's house was spotless, and she would have no concerns about PJ returning to live with Kristen, even though she had never seen Kristen parenting him.
Kristen. She explained she does not have a boyfriend; no one else lives in the house with her; Kevin is one of her best friends, but they are not romantically involved. She testified she has been in counseling with Kathleen Housley for the past year and a half; she was still in counseling; she has completed all of the required sessions but continues to go to counseling once a week; she likes the counseling; it helps her; and she agreed with the counseling report that stated she had taken responsibility for her actions. Kristen stated she has been involved in the case all along, not just recently; she has had drug screens every week, not just recently; she has passed the drug screens and the times she has not, she returned to be retested; she acknowledged she had a positive result for "benzos" three weeks prior to the hearing but stated she did another test, which came out negative. She stated PJ had always made straight A's and been a good student. Kristen testified she was current on her child-support payments. She stated she lacked only two parenting classes to complete those requirements; she denied having a drinking problem; and she said she had taken a drug screen just before the hearing and it was negative. She stated she had changed to a daytime job and would not need a nighttime babysitter for PJ. She said she was employed full-time and had sufficient income for herself and PJ. Kristen explained that PJ's father died when PJ was about two and a half. According to Kristen, she looked for the grandparents so they could be part of PJ's life, and they saw him about four or five times before "all of this started," when PJ was about eight and a half. She indicated that was the first time they ever saw him. She stated: it was not in PJ's best interest for her rights to be terminated; he had been with her his whole life until he was taken into custody by DHS; she made a mistake, but she had learned from it, and she was not a bad mother.
Kristen confirmed PJ had two older half-brothers, TT and CT, both of whom lived with their father in Pea Ridge, and she had not had visits with them "since all this started." Upon questioning by the trial court, she clarified that her visits with her two other sons, TT and CT, had stopped six months prior to PJ being taken into DHS custody; and that their father, Terry, had gotten emergency custody of them in *224 August 2015. She testified her visits with TT and CT had to be supervised; "they" said she is not a fit parent; she had been fighting with their father for custody "going on 14, 15 years now"; she lost custody of them before PJ went into foster care in August 2016; and her drinking started then.
Kristen also acknowledged that three and a half or four years ago, she was seeing a man named Travis Bell, who has since been convicted of first-degree murder and was serving a life sentence. According to her, he was a "good guy" when he was with her. She further acknowledged, however, he broke down the door to her house; PJ was not home when it happened but later found out about it; and the police got involved. She confirmed she had a hair-follicle test a year ago that was positive for marijuana, later acknowledging the date on the hair-follicle test was July 21, 2017, which would have been closer to four months ago. She stated PJ knew Bell was in prison, and she did not believe PJ was scared of him.
PJ. PJ testified he was in fifth grade and eleven years old. He expressed the desire to live with his grandparents. He stated before he started living with his grandparents, he was around drugs. He testified his mother always got arrested, and "she was crazy." He said she hung around bad people, would lie a lot, and left him different places because she said she was too drunk to take him with her. He testified he did better in school living with his grandparents than he did with his mother; he missed a lot of school when he lived with his mother. He said the reason he did not want to see his mother was because she had done a lot of bad things like drugs and hanging around bad people; she disappointed him; he did not like her saying she would come and then missing; and he did not like her lying to him.
Terry Thurman (CT and TT's father). He testified DHS had investigated him three times that were unfounded. He did not know of any times DHS had been called to investigate Kristen pertaining to CT and TT.
Kristen. She testified again, denying that: PJ made bad grades when he was with her; she lied to him; he missed a lot of school when he was with her; she took him around places where there were drugs (except when she took him around her family, which consisted of alcoholics and drug addicts, so she stopped taking him around them); and she was drunk in front of him (except for the time he was taken into emergency custody).
The order terminating Kristen's parental rights to PJ was entered on January 9, 2018. This appeal followed.
Discussion
Our review of cases in which parental rights have been terminated is de novo. Miller v. Arkansas Dep't of Human Servs. , 2017 Ark. App. 396, 525 S.W.3d 48. The grounds for termination must be proved by clear and convincing evidence, which is such a degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. Id. Our inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. Id. Credibility determinations are left to the fact-finder. Id.
Termination of parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best interest of the child. Id. The first step requires proof of one or more statutory grounds for termination; the second step, the best-interest analysis, includes consideration of the likelihood the juvenile will be adopted and of the potential *225 harm caused by returning custody of the child to the parent. Id. In determining potential harm, which is forward-looking, the court may consider past behavior as a predictor of likely potential harm should the child be returned to the parent's care and custody. Id. There is no requirement to establish every factor by clear and convincing evidence; after consideration of all factors, the evidence must be clear and convincing that termination is in the best interest of the child. Id.
I. Statutory Grounds Supporting Termination
The trial court concluded DHS proved three statutory grounds for termination: 1) PJ had been adjudicated dependent-neglected and had continued out of Kristen's custody for twelve months and despite a meaningful effort by DHS to rehabilitate Kristen and correct the conditions that caused removal, those conditions had not been remedied by Kristen. Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a ) (Supp. 2017); 2) PJ had lived outside Kristen's home for a period of twelve months, and Kristen willfully failed to provide significant material support in accordance with her means or to maintain meaningful contact with PJ. Ark. Code Ann. § 9-27-341(b)(3)(B)(ii)(a ) ; and 3) other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate placement of PJ in Kristen's custody is contrary to PJ's health, safety, or welfare and that, despite the offer of appropriate family services, Kristen has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate her circumstances that prevent PJ's placement in her custody. Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a ).
Kristen challenges each of the three statutory grounds found by the trial court. We address only one, the "subsequent factors" ground, because we conclude the trial court did not clearly err in finding DHS proved this statutory ground, and proof of one statutory ground is sufficient to support this prong of a termination.
Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)(a ) provides:
That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances which prevent the placement of the juveniles in the custody of the parent.
A parent's failure to comply with the court's orders can serve as a subsequent factor upon which termination can be based. Bynum v. Arkansas Dep't of Human Servs. , 2017 Ark. App. 471, 528 S.W.3d 859.
Here, in stating its findings in the termination order regarding the subsequent-factors ground, the trial court reviewed several subsequent factors, including the fact that Kristen had not maintained weekly contact with DHS, had not submitted to all requested random drug screens, had submitted a hair-follicle drug screen in July of 2017 that was positive for marijuana, had dyed her hair prior to the hair-follicle test in violation of the court's order not to do so, and had refused a drug screen on August 15, 2017, stating that she could not produce a urine sample. The court further found Kristen was not credible at the termination hearing when she testified she had complied with the case plan and court's orders and made progress. Because *226 only one ground is necessary to terminate parental rights, Kristen's failure to comply with the trial court's orders constituted sufficient evidence under the statute. It is therefore unnecessary to discuss the other statutory grounds.
II. Best-Interest Determination -- Potential Harm
Kristen does not challenge the adoptability prong of the trial court's best-interest determination. Rather, she contends the trial court clearly erred in finding DHS had established the potential-harm prong. We disagree.
In assessing the potential-harm factor, the trial court is not required to find that actual harm would ensue if the child were returned to the parent or to affirmatively identify a potential harm. Bynum, supra. The potential-harm analysis is to be conducted in broad terms. Id. Past actions of a parent over a meaningful period of time are good indicators of what the future may hold. Id. Our de novo review of the evidence before the trial court in this case does not convince us it was clear error to find potential harm if PJ were returned to Kristen's custody. Kristen's past behavior was a logical predictor of likely potential harm should PJ be returned to her care and custody.
Affirmed.
Vaught and Hixson, JJ., agree.